IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

EMON V. HOLLINS,

                     Plaintiff,

     v.

LANCE WIERSMA, NOBLE WRAY,
TOM WOODMANSEE, CORY NELSON,                OPINION and ORDER
SAMANTHA KELLOGG, PAIGE VALENTA,
CITY OF MADISON, ISMAEL OZANNE,                 17-cv-738-jdp
RITA RUMBELOW, ANGELA JONES,
LINDA KETCHAM, BARBARA McKINNEY,
MARK MELLINTHIN, PAUL REED, LISA SIEGEL,
WILLIAM BAUDHUIN, and JAY LENGFELD,

                  Defendants.

Plaintiff Emon V. Hollins, appearing pro se, is an inmate at Waupun Correctional Institution. Before his incarceration, he was selected for the Madison Police Department's "focused deterrence program" designed to reduce recidivism among violent repeat offenders in the city.

Officials from local, state, and federal governments and community organizations coordinated to select participants in the program. Hollins contends that these officials violated his right to due process by not letting him contest his selection, and that they violated his right to equal protection by racially discriminatory selection and by singling out Hollins in particular. He also contends that Madison officials defamed him by spreading false information about him.

Three groups of defendants have filed motions for summary judgment, all of which I will grant. Hollins fails to show that his due process or equal protection rights were violated by the defendants, and some defendants are entitled to qualified immunity.

A group of federal-employee defendants have filed a motion to dismiss the complaint, which I will deny because I can't decide the matter on the pleadings alone. And a group of state-employee defendants have not yet filed a dispositive motion. But my summary judgment analysis of Hollins' claims will almost certainly apply to the federal and state defendants as well. So I will direct Hollins to show cause why I should not dismiss the claims against those defendants, too.

PRELIMINARY MATTERS

The case is complex because a number of governments and community organizations collaborated in selecting participants for the focused deterrence program. And each group of defendants has a slightly different status in the case. At this point, the defendants have filed the following dispositive motions:

- A motion to dismiss filed by defendants Rita Rumbelow, Paul Reed, Lisa Siegel, and William Baudhuin (the "federal defendants"), Dkt. 87.

- A motion for summary judgment filed by defendants Noble Wray, Tom Woodmansee, Cory Nelson, Samantha Kellogg, Paige Valenta, Jay Lengfeld, and the City of Madison (the "city defendants"), Dkt. 117.

- A motion for summary judgment filed by defendant Angela Jones of the United Way of Dane County, Dkt. 113.

- A motion for summary judgment filed by Linda Ketcham and Barbara McKinney of the Madison-area Urban Ministry, Dkt. 127.

Defendants Ismael Ozanne, Mark Mellinthin, and Lance Wiersma, who I'll refer to as the "state defendants," have not yet filed a dispositive motion, although the claims against them are closely intertwined with the claims discussed in the dispositive motions filed by the other defendant groups. The court stayed the dispositive motions deadline pending a ruling on

proposed amendments to the complaint, but the parties were directed to finish briefing the dispositive motions that had already been filed. Dkt. 133.

## A. Hollins's claims

Hollins brings the following claims:

- Race-based equal protection claims for being selected to the focused deterrence program because he was black, instead of white candidates who had more serious criminal records than him.

- "Class of one" equal protection claims for being selected to the program instead of others, regardless of race, who had more serious criminal records than him.

- Due process claims for having his reputation harmed and his legal rights altered because of his selection to the program, without him being given an opportunity to clear his name.

- Wisconsin-law defamation claims against the City of Madison for spreading false information about him and his criminal record, including publishing an article on the city's website stating that he might be the first program member to be sent back to prison.

The city defendants contend that Hollins failed to timely file a notice of claim under Wis. Stat. § 893.80 about the alleged defamation. Hollins concedes that the defamation claims should be dismissed. So I will grant the city defendants' motion for summary judgment on those claims.

## B. Non-dispositive motions

The parties have also filed a number of non-dispositive motions.

Hollins filed a motion for extension of time to respond to defendants' summary judgment motions because of lack of access to the prison law library, Dkt. 136, and he soon followed with his opposition materials. I'll grant his motion for extension of time. After the city defendants included more detailed information about individual program candidates in their summary judgment reply brief, I granted Hollins's motion to file a sur-reply, *See* Dkt. 176.

3

Hollins filed a motion for a one-day extension of time to file his sur-reply materials, again because of law-library troubles, Dkt. 179, and he filed those materials the next day. I'll grant that motion for an extension of time.

The city defendants filed a motion for Hollins to correct citations to exhibit numbers in his summary judgment response because citations to some of the exhibits appeared to be misnumbered. Dkt. 144. Defendants Ketcham and McKinney filed a motion to join in that motion. Dkt. 145. Hollins followed with corrected versions of his materials, Dkt. 149–154, so I'll deny defendants' motions as moot.

In part in response to the federal defendants' motion to dismiss, Hollins filed two proposed amended complaints, Dkt. 99 and Dkt. 100, which I'll construe as including motions for leave to amend the complaint. He says that the purposes of the complaint at Dkt. 99 are to (1) add parallel claims against the federal defendants under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971); and (2) replace state probation supervisor defendant Lance Wiersma with supervisor Art Thurmer. Hollins says that his complaint at Dkt. 100 fixes his omission of defendant McKinney in Dkt. 99.

For reasons explained further below, Hollins's amendments are likely immaterial to the outcome of the case, so I'll deny his motions for leave to amend the complaint. Should any of his claims survive my order to show cause, I'll consider allowing Hollins to amend his complaint. Hollins also filed a motion to stay a decision on defendants' various summary judgment motions pending a ruling on his amended complaints and on the federal defendants' motion to dismiss. Dkt. 183. I'll deny Hollins's motion because all of the pending motions can be decided in this order.

Hollins has filed a motion in limine asking me to bar defendants from using their version of "candidate summary" forms at trial because he can prove that the city defendants fabricated them; he was given a different version of his form than what defendants provided the court. *See* Dkt. 174. I'll discuss the dispute over the different versions of these documents below. I'll deny the motion in limine because it's premature to consider trial exhibits.

## C.  Federal defendants' motion to dismiss

The federal defendants were the four federal-government members of the committee that selected Hollins to participate in the focused deterrence program. I granted Hollins leave to proceed on equal protection and due process claims under 42 U.S.C. § 1983 against these four defendants and the other members of the selection committee. The federal defendants have filed a motion to dismiss those claims in part because, as federal employees, they cannot be subject to liability under § 1983. *See, e.g., Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017).

As stated above, Hollins responded in part by asking to amend his complaint to instead seek parallel constitutional claims against the federal defendants under *Bivens*. *See* Dkt. 99 and Dkt. 100. The federal defendants argue that the limited scope of *Bivens* should not be extended to these types of discrimination and due process claims.

The federal defendants are likely correct that it would not be appropriate to extend *Bivens* to the claims raised by Hollins. *See Abbasi*, 137 S. Ct. at 1857, 1859–60 (stating that expanding *Bivens* to new contexts is "disfavored judicial activity," and concluding that federal courts should not expand *Bivens* actions to reach "new contexts" unless "special factors" counsel otherwise). But that doesn't resolve these claims. Hollins alleges that the federal defendants assisted local and state officials in violating his rights through his selection to the city's focused deterrence program. So there is a plausible basis for saying that the federal defendants were

5

acting under color of state law. *See Hampton v. Hanrahan*, 600 F.2d 600, 623 (7th Cir. 1979), *rev'd in part on other grounds,* 446 U.S. 754 (1980) ("[W]hen federal officials are engaged in a conspiracy with state officials to deprive constitutional rights, the state officials provide the requisite state action to make the entire conspiracy actionable under section 1983.").

I won't dismiss the claims against the federal defendants under the theory that they are not subject to liability under § 1983. They otherwise make arguments to dismiss the case that are essentially motions for reconsideration of my screening orders granting Hollins leave to proceed on his claims against them. Nothing in the motion to dismiss persuades me that Hollins failed to properly plead his claims. So I'll deny the motion to dismiss.

## MOTIONS FOR SUMMARY JUDGMENT

### A. Undisputed facts

Except where noted, the following facts are undisputed.

Plaintiff Emon V. Hollins is an inmate currently confined at Waupun Correctional Institution. This case is about Hollins's involvement in the City of Madison Police Department's focused deterrence program.

#### 1. Creation of Madison's focused deterrence program

In 2010, the City of Madison Police Department (MPD) researched deterrence strategies employed by law enforcement agencies around the country, particularly ones focusing on deterring crimes committed by repeat violent offenders, because those offenders were responsible for a disproportionate percentage of crime in Madison and they require more law enforcement and community resources than other offenders.

One strategy, called "focused deterrence," is to identify individuals who are responsible for creating a disproportionate amount of crime and then focus law enforcement and community resources on them. The participating offenders are provided resources and support not otherwise available to them, but law enforcement agencies commit to seek swift and aggressive punishment through the criminal justice system if a participant reoffends. The focused deterrence approach relies on collaboration between the police and community resource providers.

Defendant Noble Wray, the MPD chief at the time, was impressed with other cities' focused deterrence programs and he believed that it would be beneficial to the Madison community to implement a similar program there. MPD began the process of creating a Special Investigations Unit (SIU) to operate a deterrence program. According to the city defendants, defendant Tom Woodmansee was instrumental in establishing the program, and he ran the SIU from 2011 to 2013. The SIU became "fully operational" in July 2011, when three detectives, defendants Cory Nelson, Samantha Kellogg, and Paige Valenta, began their assignments in the SIU.

## 2. Selection of participants

Nelson, Kellogg, and Valenta (who I will also refer to as the "SIU detectives") were tasked with reviewing offender files and picking a list of finalists to present to the program's selection committee. Hollins was ultimately selected as part of the first group of ten participants in the program's history. As of January 31, 2018, the program had selected 12 rounds of participants, with a total of 132 individuals: 112 were black, 15 were Caucasian, and 5 were Hispanic.

The SIU detectives say that they identified possible offender candidates for participation in the program by weighing several factors, including the severity and immediacy of the threat to public safety posed by the candidate; the candidate's overall impact on the community; the number, frequency, and recency of offenses; the amount of police resources that had been dedicated to the candidate; reasons to believe that the candidate was actively offending; and the candidate's overall criminal history. Only individuals who live or work in the Madison area and who were not incarcerated were eligible for selection. Hollins argues that this explanation contradicts what the city defendants previously said was the method by which finalists were chosen: he cites an MPD report in which the SIU detectives state that the SIU "narrowed the candidate pool to those individuals with the most prolific violent convictions." Dkt. 99-1, at 16.

Starting in July 2011, Nelson, Kellogg, and Valenta reviewed information for more than 150 candidates, focusing on offenders with the following offenses: homicide, arson, assault, battery, domestic abuse, kidnapping, physical abuse of a child, sexual assaults, stalking, robbery, and weapon offenses. The SIU detectives also sought information about candidates from MPD's Criminal Intelligence Section officers and crime analysts and the Department of Corrections. During this process, Nelson, Kellogg, and Valenta knew the name and race of each candidate.

The SIU detectives pared down the initial list to a more manageable number by eliminating those who were currently incarcerated or who did not live or work in Madison. The list was further reduced by comparing the criminal backgrounds of the candidates and making qualitative judgments about the candidates' criminal histories, including the recency of candidates' criminal conduct and whether a candidate was currently offending. They say that

they also considered charged offenses for all candidates because regardless of whether an individual is ultimately convicted, a charged offense indicates that there was adequate probable cause to charge the person with a crime, and responding to those incidents still requires significant police and community resources.

Defendants Nelson, Kellogg, and Valenta picked 18 candidates, including Hollins, to present as finalists to the program's notification selection committee. The information they used to select Hollins was reflected in two versions of "candidate summary" forms—a long form and a short form.

Hollins's long-form candidate summary provided by the city defendants, Dkt. 120-2, contained 16 contacts with various police departments, dating from April 27, 2004 to November 24, 2010. It detailed the circumstances regarding his felony convictions for threatening to injure, first-degree recklessly endangering safety, and possessing THC with intent to deliver, and his multiple misdemeanor convictions, including convictions for battery with a repeater enhancement, resisting or obstructing an officer, disorderly conduct, and carrying a concealed weapon. Hollins had also been charged with various other offenses for which he was not ultimately convicted, including two counts of misdemeanor bail jumping, three counts of misdemeanor disorderly conduct, felony discharging a firearm from a vehicle into a building/vehicle, felony first-degree recklessly endangering safety, and felony escape from criminal arrest. The long summary identified him as having ten victims. Hollins also has several convictions for operating a vehicle after revocation.

Hollins's short-form candidate summary—which the city defendants say was directly provided to the selection committee members—stated his age (22 at the time), that he was a member of the Gangster Disciples, and that he had zero federal convictions, five felony

convictions, eight misdemeanor convictions, and zero pending cases. This short summary appears to overstate the number of both felony and misdemeanor convictions that Hollins has, by including the following charges that were dismissed but read in to his other convictions: felony discharging a firearm into a building, felony recklessly endangering safety, two misdemeanors for bail jumping, and misdemeanor disorderly conduct. But Hollins does not raise this discrepancy (his theory is that the short summaries were not even used by the committee) so I need not address the discrepancy further.

The city defendants say that Nelson, Kellogg, and Valenta selected Hollins to be a finalist because he had multiple violent convictions, five of which involved serious threats or acts of violence against women. They say that his bail-jumping and operating-after-revocation convictions demonstrated that he failed to adhere to the rules of his supervision. They state that a "significant" amount of police resources had been directed toward Hollins around the time of his selection.

Hollins contends that Nelson, Kellogg, and Valenta discriminated against him in this screening process. He says that they failed to pick five white candidates as finalists despite the white candidates' more prolific violent-crime histories. He also says that they failed to select 15 "Black, Asian, and Latino" candidates over him despite those candidates' more prolific violent-crime histories. Matching the candidates' initials on the summary forms, Dkt. 99-1, at 54–68 to a list of the candidates that includes their initials and race, Dkt. 154-10, shows that 13 of these 15 candidates were black, with one listed as "white Asian" and one as "white Hispanic."

The program's notification selection committee met on October 18, 2011. The selection committee included the following members, all defendants in this case:

- Jay Lengfeld, from the MPD

- Ismael Ozanne, the Dane County district attorney

- Mark Mellinthin, from the Wisconsin Department of Corrections

- Rita Rumbelow, from the United States attorney's office

- Paul Reed and Lisa Siegel, from United States Probation and Pretrial Services

- William Baudhuin, from the United States Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives

- Angela Jones, from the United Way of Dane County

- Linda Ketcham and Barbara McKinney, from the Madison-area Urban Ministry

The selection committee chose the candidates who would participate in the program. These selections were based on the candidate's criminal history and police contact history.

SIU detectives Nelson, Kellogg, and Valenta say that they gave the committee members the short-form candidate summaries, in which the candidates were identified by number, not name. *See* Dkt. 123-1. Hollins disputes this, saying that the committee was given the long forms, which he also says included name and race information. His support for this is committee member Angela Jones's declaration, Dkt. 115, stating that the forms she received contained police contact history and number of victims, which was included only on the long forms. I'll discuss this dispute more below.

The SIU detectives say that they used the long-form candidate summaries in presenting information orally to the committee or answering questions they had. *See* Dkt. 123-2. A few of these summaries also included a candidate's name, initials, or race. There is a factual dispute over whether Hollins's long-form summary contained his name and race, because Hollins produces a version of the long summary that includes his name and race. As with the dispute over Jones's testimony, I'll discuss the dispute over Hollins's long-form summary below. In any

event, the detectives and defendants on the committee who have provided declarations all say that the names and races of the finalists were not disclosed to the committee.

The committee selected ten finalists to participate: Hollins was one of eight black finalists chosen. One white finalist was chosen and one Latino finalist was chosen.

Hollins contends that the selection committee, like the SIU detectives, discriminated against him and more generally against black candidates. He says that the committee failed to pick two white candidates as finalists despite the white candidates' more prolific violent-crime histories. He also says that the committee failed to select five black candidates over him despite their more prolific violent-crime histories.

### 3.  Hollins's participation in the program

Participants were required to attend a "notification" meeting, at which the SIU detectives delivered an in-person message to the participants, informing them that they would be monitored more aggressively than they have been in the past, that they would be subjected to increased scrutiny by law enforcement and that if they commit additional crimes, the SIU would advocate for maximum penalties. But participants were also given greater access to community resources and support, such as education, housing, transportation, and substance abuse and mental health treatment.

The notification meeting for Hollins's group was on November 8, 2011. Hollins's probation officer, Joe Packard, told him that he would be "locked up" if he didn't attend. Hollins attended the meeting, although he left without meeting with any of the resource providers.

Within a couple of weeks after the notification meeting, Hollins was taken into custody twice by probation agent Packard. The precise reasons for these arrests are disputed, but it is

undisputed that Hollins was ticketed twice for driving without a license. While Hollins was at the Dane County Jail, he threatened to harm officers and he repeatedly contacted a previous victim of his domestic violence. Packard sought revocation of Hollins's probation and in February 2012, Hollins's probation was revoked.

## B. Analysis

### 1. Equal protection race discrimination

Hollins brings claims under the Equal Protection Clause of the Fourteenth Amendment under both race-discrimination and "class of one" theories. I'll start with his theory that he was selected in part because he was black, over white candidates who should have been selected over him based on objective criteria.

To prove his race-based equal protection claim, Hollins "must show that the program 'had a discriminatory effect' and that the defendants 'were motivated by a discriminatory purpose.'" *Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017) (quoting *Chavez v. Illinois State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001)); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). Generally, a plaintiff may show different treatment either through statistical analysis or by identifying a particular similarly situated member of the unprotected class who was treated differently from him. *Alston*, 853 F.3d at 906. Discriminatory purpose requires a showing that defendants selected "a particular course of action at least in part because of . . . its adverse effects upon an identifiable group," and "means more than simple knowledge that a particular outcome is the likely consequence of an action." *Id.* at 907 (citing *Chavez*, 251 F.3d at 645).

13

The City of Madison "may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978); *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009)).

This is not the first time that a court has reviewed the constitutionality of actions associated with the focused deterrence program. In *Alston*, 853 F.3d at 907, an appeal from a decision of this court, No. 13-cv-635-bbc, a black plaintiff brought a similar equal protection race-discrimination claim for being selected for the program. Alston's key piece of evidence was the fact that the overwhelming majority of those selected for the program were black, despite being only a small minority of the Madison population. *Id.* at 906. The Court of Appeals for the Seventh Circuit noted that even defendants considered those statistics to be "regrettable," but the court concluded that those statistics were not sufficient at summary judgment because they didn't prove discriminatory effect: they did not address "whether black, repeat violent offenders were treated differently from white, repeat violent offenders." *Id.* at 907. Nor did those statistics show discriminatory purpose because there was "no evidence about the number of black, repeat violent offenders who qualified for the program but were not chosen" or "the number of white, repeat violent offenders chosen compared to the number of white, repeat violent offenders who could have been chosen." *Id.* at 908.

This court recently decided another case with similar race-discrimination claims about the program, also concluding that statistics about the racial composition of individuals placed

in the program (predominately black candidates) versus the black population in Madison were not enough to prove discriminatory effect or purpose. *Smith v. City of Madison*, 413 F. Supp. 3d 823, 836 (W.D. Wis. 2019), *reconsideration denied*, No. 17-cv-856-bbc, 2020 WL 553861 (W.D. Wis. Feb. 4, 2020).

In his complaint, Hollins includes allegations about the Madison population and arrest statistics: he includes exhibits stating that black persons make up 7 percent of the Madison population and account for 45 percent of the arrests; white persons are about 79 percent of the population and account for 53 percent of the arrests. Statistics similar to these have already been rejected as inadequate to support an equal protection claim in *Alston* and *Smith*. In his summary judgment materials, Hollins no longer focuses on those numbers or on other Madison race and crime statistics to prove his claim. Instead, he states that all ten of the candidates chosen for the program during his round were minorities (eight black finalists and two Latino finalists). This statistic is incorrect: the official list of participants shows that eight of the participants (including Hollins) were black and two were white, although the parties agree that one of the selections listed as white is Latino. *See* Dkt. 154-6. In any event, the Court of Appeals for the Seventh Circuit already considered the racial makeup of the participants in the program—86 percent of the participants were black at the time of the *Alston* case and more recent numbers here show that 85 percent of the participants were black—and concluded that the statistics alone did not prove discriminatory effect, much less intent.

But Hollins also tries to prove discrimination though the use of comparators. Hollins identifies (1) five white candidates whom he says should have been selected over him by the SIU detectives when they pared the list down to 18 finalists, and (2) two white finalist candidates whom he says that the selection committee should have selected over him. Hollins

15

contends that unlike in *Alston* or *Smith*, he has proven that defendants discriminated against him on the basis of his race because he presents individualized evidence about himself and the white candidates.

### a. SIU detectives

I'll address the SIU detectives' finalist-selection process first. It is undisputed that defendants Nelson, Kellogg, and Valenta knew the name and race of each of the more than 130 candidates they considered before paring the list down to 18 finalists. Hollins says that there were five white candidates who should have been named as finalists instead of him because the white candidates had more prolific histories of violent crime. For purposes of this section of the analysis I'll assume that he's correct about the severity of the white candidates' criminal histories.

The city defendants argue that three of these five white candidates were categorically ineligible for the program and thus cannot be compared to Hollins. They rely on the candidate summaries provided by Hollins, Dkt. 99-1, at 22–26, and defendant Kellogg's second declaration, Dkt. 163. Hollins agrees with the city defendants that white candidate S.G.L. was no longer on community supervision and was therefore not eligible for the program. But defendants do not provide admissible evidence to prove that the other two candidates were ineligible.

Kellogg says that white candidate J.C.S. was arrested for a parole violation in August 2011 and was returned to prison in late October 2011, and thus was not eligible for selection in November 2011. But Kellogg does not support those statements with evidence proving

J.C.S.'s incarceration,[1] and that information is not on the candidate summary. Instead, it says that J.C.S. was on probation; the "incarcerated" box on the form was not checked. Dkt. 99-1, at 22.

Similarly, Kellogg says that white candidate M.E.A. was arrested for strangulation in December 2010 and his probation was revoked in March 2011. But Kellogg does not provide evidence supporting that. The candidate summary says that M.E.A. was on probation, and the "incarcerated" box on the form was not checked. Dkt. 99-1, at 23. So there is a disputed issue of material fact about whether those candidates were eligible for the program.

The city defendants say that the profiles for the other two white candidates put forward by Hollins "reflect productivity in society" and therefore were not good candidates for the program. Kellogg says that white candidate K.R.M. was reporting as required to his probation agent from October 2011 until he was successfully discharged from probation on July 13, 2012, and that his most recent violent offense was in 1999. Kellogg says that K.R.M. was not considered because of an upcoming discharge date and because "he was doing well and following up with his probation agent as required." Dkt. 163, at 2. Not only does Kellogg fail to provide evidence showing that K.R.M. was "doing well," the fact that K.R.M. reported to his probation agent from October 2011 to July 2012 isn't something that Kellogg would have known at the time the city defendants made their selections, which occurred sometime before the October 2011 selection meeting. So there isn't enough evidence here to rule out K.R.M. as a comparator.

---

[1] Because the other candidates' identifying information is obscured, I cannot confirm any of the details using publicly available online court records.

Kellogg says that white candidate R.D.R. was doing well on probation, had no violations since his release in December 2010, and was enrolled in job training classes. The evidence for this is what appears to be a handwritten note attached to his candidate summary, passing along information from his probation agent. Dkt. 99-1, at 25. Hollins says that this is inadmissible hearsay, although he doesn't develop this argument. The statement isn't hearsay because defendants aren't using it for the truth of the matter asserted in the note, but rather how they responded to the note—by eliminating R.D.R. from contention because the note conveyed positive information about his progress. Hollins says that the mere fact that they contacted R.D.R.'s probation agent is itself evidence of discrimination because they did not talk to Hollins's probation agent to potentially gain positive information about him.

Ultimately it is immaterial whether I include R.D.R. in the pool of white comparators to Hollins along with J.C.S., M.E.A., and K.R.M. Hollins says that unlike the plaintiffs in *Alston* and *Smith*, he has provided specific evidence showing that defendants failed to pick white candidates with substantially similar or worse criminal histories as finalists. He argues that evidence of a single white comparator being treated better is enough for him to survive summary judgment, citing *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 406–07 (7th Cir. 2007) ("A single comparator will do; numerosity is not required.").

In a vacuum, proof of a single white comparator being treated better than Hollins could be enough for him to survive summary judgment. Here, I'll assume that Hollins has three or four white comparators (J.C.S., M.E.A., K.R.M., and perhaps R.D.R.). But Hollins's race-discrimination claim is fatally undermined by additional evidence he presents: he says that Nelson, Kellogg, and Valenta also failed to select 15 minority candidates—13 of them black—even though they had similar or worse criminal histories than Hollins. This evidence shows

that the SIU detectives didn't favor only white candidates over Hollins. Hollins can't ignore the minority candidates who he says were also treated better than him: Hollins is really saying that Nelson, Kellogg, and Valenta unfairly chose him over a group of about other 20 candidates, only some of whom were white. *See Crawford v. Indiana Harbor Belt R. Co.*, 461 F.3d 844, 845 (7th Cir. 2006) (plaintiff "must not pick and choose" comparators to exclude data undercutting her theory); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646–47 (3d Cir. 1998) ("Plaintiff cannot "pick and choose a person she perceives is a valid comparator who was allegedly treated more favorably, and completely ignore a significant group of comparators who were treated equally or less favorably than she.").

Without telling comparator evidence, Hollins is in the same position as the plaintiffs in *Alston* and *Smith*. The information he provides doesn't show that Nelson, Kellogg, and Valenta treated white repeat violent offenders differently than black repeat violent offenders. And he doesn't provide more direct evidence suggesting that these defendants intended to discriminate by race either. No reasonable jury could conclude that the decision to name Hollins as a finalist was motivated by race. I'll grant summary judgment to Nelson, Kellogg, and Valenta on the race-discrimination claim against them.

### b. Selection committee

Hollins also contends that the selection committee of officials from local, state, and federal governments and community organizations racially discriminated in choosing participants out of the pool of finalists. His main evidence in support is that the committee selected him over two white candidates who had worse violent-crime histories. I'll again assume in this section of the analysis that Hollins is correct about the comparison of his history to the white candidates.

19

But defendants contend that the committee didn't know the races of the finalists, so they couldn't have discriminated by race. All of the defendants submitting declarations about the materials provided to the committee members state that the candidate summaries did not disclose the finalists' names or races. *See* Dkt. 115, at 2 (Jones); Dkt. 120, at 3 (Kellogg); Dkt. 122, at 5 (Nelson); Dkt. 123, at 3 (Valenta); Dkt. 130, at 1 (McKinney); Dkt. 131, at 2 (Ketcham). Despite these declarations, there is a dispute about precisely what version of the summaries were given to the committee members. Committee member Angela Jones says that the summaries she was given included police contact history and number of victims—information that was only in the long-form versions of the summaries, some of which did include the candidate's name, initials, or race. And although the longer version of Hollins's summary provided by the city defendants did not include his name or race (he's identified as candidate No. 6), Hollins produces a version of the long-form summary that does include his name and race. *Compare* Dkt. 120-2 (the city defendants' version) *with* Dkt. 143-2 (Hollins's version).

It's unclear why the parties' versions of the forms are different. I note that the city defendants' version of the summary has more up-to-date information, including two police contacts in 2010, while Hollins's version ends with 2009 data. However, both versions are dated September 29, 2011. The city defendants do not address this problem in their briefing. I conclude that there's a genuine dispute of fact about what information was on Hollins's long-form summary.

But that doesn't mean that the committee actually received the long-form candidate summaries. Hollins argues that Jones's declaration testimony that she saw police contact and victim information raises a genuine dispute of material fact about whether the committee

members got the long-form summaries. If the committee got long-form versions, the committee members would have seen at least some name and race data. Because Hollins possessed a long-form version of his summary that include his name and race, different from the city defendants' version, he also argues that the forms submitted to the court by the city defendants are fabrications.

The question is whether a reasonable jury could take the discrepancy in Jones's testimony and infer that the committee actually did have the long-form summaries with name and race data, even though Jones herself and five other defendants say that no name and race data was shared with the committee. Jones's testimony about the contents of the summaries appears to be contradictory—the shorter forms wouldn't have included the candidates' police contact history and number of victims, but the longer forms wouldn't have obscured all of the finalists' name and race data. So either Jones made an error in describing the forms as including that information, or several defendants were mistaken or lying by saying that the committee was not given name and race data. In her reply brief, Jones argues that the discrepancy in her testimony is immaterial because its undisputed that the detectives provided information at the meeting orally as well as in written materials. I take her to be saying that the police-contact and number-of-victims information she noted in her declaration as coming from the printed materials may have come from the SIU detectives' oral presentation instead. *See* Dkt. 159, at 4.

Given the unanimous testimony, including Jones's, directly stating that the committee did not have race and name data, a reasonable jury would need more than a minor discrepancy in Jones's declaration to find that several defendants are lying about the information they had before them and that the forms provided to the court were fabricated. *See Pugh v. City of Attica*,

259 F.3d 619, 625 (7th Cir. 2001) (mere "scintilla of evidence" is not enough to create dispute of fact). And Jones provides the only reasonable explanation, which is that she erred in characterizing the contents of the summaries she received. I conclude that there is no genuine factual dispute whether the committee members knew the candidate's races when they made their selections. They did not. Therefore, they could not have discriminated on the basis of race.

And even if the committee did know the finalists' races, Hollins runs into the same problem that he had with his claim about the SIU detectives' finalist selections. Hollins says that along with the two white finalists who should have been picked over him, there were five black finalists who should have been chosen over him but were not. So there are more pertinent comparators than just the two white finalists that he cites. Given that Hollins says that he was selected over several more deserving black and white comparators, no reasonable jury could conclude that the committee discriminated on the basis of race in making its decisions.

## 2. Equal protection class of one

Hollins also says that he was selected for the program over other candidates, regardless of race, who had more serious criminal records than him. I granted Hollins leave to proceed on "class of one" equal protection claims based on this allegation.

The Equal Protection Clause protects people from discrimination by a government actor who arbitrarily and irrationally singles out one person for poor treatment for no rational reason. "The classic class-of-one claim is illustrated when a public official, 'with no conceivable basis for his action other than spite or some other improper motive . . . comes down hard on a hapless private citizen.'" *Swanson v. City of Chetek*, 719 F.3d 780, 783–84 (7th Cir. 2013) (citing *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005)). To survive summary judgment on a class-of-

one claim, the plaintiff must demonstrate at a minimum (1) that defendants intentionally treated him differently from others similarly situated; and (2) that there is no rational basis for the difference in treatment. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). There remains lingering uncertainty about whether a plaintiff is also required to prove that defendants had some illegitimate motive. *See Del Marcelle v. Brown County Corp.*, 680 F.3d 887, 912 (7th Cir. 2012) (Wood, J., dissenting).

As with Hollins's race-discrimination claims, there are two separate sets of decisions that Hollins believes violated his rights: (1) SIU detectives Nelson, Kellogg, and Valenta's winnowing of more than 130 candidates down to 18; and (2) the selection committee's choice of 10 of those 18 finalists to participate in the program. I'll start with the SIU detectives.

Hollins says that there were 20 candidates who should have been selected over him because they had more prolific violent-crime histories. Hollins does little to develop the comparison between himself and these candidates; for the most part he just lists numbers and types of convictions for these candidates. *See* Dkt. 138, at 5–6, 9–11. Some of them have longer criminal records than Hollins and others have individual crimes like reckless homicide that would appear to be more serious than Hollins's. But the city defendants describe a range of other factors that the SIU detectives considered, including the immediacy of the threat to public safety posed by the candidate, the candidate's overall impact on the community, the recency of offenses, the amount of police resources that had been dedicated to the candidate, reasons to believe that the candidate was actively offending, and whether the candidate was in Madison and on active supervision.

Hollins does not address these factors by considering their effect on his or other candidates' summaries, which is a problem because it's his burden to prove his claims. Instead,

23

he says that defendants' explanation should be disregarded because its different from what they previously said in a report: that the SIU was supposed to "narrow[] the candidate pool to those individuals with the most prolific violent convictions." Dkt. 99-1, at 16. He also cites declarations by Wray and Woodmansee in another case in this court saying that "the SIU was created to focus attention on the most violent repeat offenders," Dkt. 99-1, at 50. But those previous statements are broad ones that do not create a mathematically precise way of figuring which candidate's criminal history is worse than another's, and there's no reason to think that those statements forbid considering other factors that would rationally be considered when determining which candidates to spend additional law enforcement resources on.

What the SIU detectives' multifaceted approach in finalist selection shows is that this is the type of determination that does not readily lend itself to a class-of-one analysis. *See Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 602 (2008) ("What seems to have been significant in *Olech* and the cases on which it relied was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed."). The task of comparing candidates with varied criminal histories, gang affiliations, number of victims, and all other factors is an inherently subjective one. Even if a jury could conclude that the decision to include Hollins in the finalist list was *incorrect* doesn't mean that it was *irrational*. Hollins doesn't address the city defendants' asserted factors in nearly enough detail to say that no conceivable rational basis for his selection. So his class-of-one claim fails against the SIU detectives.

But even had Hollins had made out a class-of-one claim, the SIU detective defendants would be entitled to qualified immunity. Government officials are entitled to qualified immunity unless their conduct violated a federal statutory or constitutional right, and the unlawfulness of their conduct was "clearly established at the time." *D.C. v. Wesby*, 138 S. Ct.

577, 589 (2018). Hollins has the burden of demonstrating that defendants' violation of the Fourteenth Amendment was "clearly established." *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017). Hollins can show that the violation was clearly established if "a violation of this right has been found in factually similar case, or that the violation was so clear that a government official would have known that his actions violated the plaintiff's rights even in the absence of a factually similar case." *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Law is "clearly established" only if it is found in Supreme Court precedent, controlling circuit authority, or "a consensus of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). The only authority that Hollins cites is *Olech*, 528 U.S. 562, a case about a village seeking a larger than customary easement from homeowners in response to their request to be connected to the municipal water system. That case is nowhere close to factually similar to this case about the Madison focused deterrence program. Hollins cites no controlling authority explaining the contours of a class-of-one claim in a fact situation similar to this case, and I am not aware of any such authority. So I conclude that qualified immunity applies to Hollins's class-of-one claims against Nelson, Kellogg, and Valenta.

Although the selection committee used somewhat different standards to pick the participants than the SIU detectives used to pick the finalists, Hollins's class-of-one claims against the selection committee has the same problems as the claims against the SIU detectives, so I'll grant the selection committee defendants' motions for summary judgment as well.

### 3. Due process

Hollins brings claims under the Due Process Clause of the Fourteenth Amendment for having his reputation harmed and his legal rights altered because of his selection to the program, without being given an opportunity to clear his name. The Due Process Clause requires the state to provide notice and an opportunity to be heard before depriving an individual of certain types of liberty or property. Public officials may violate an individual's right to due process if they injure his reputation and alter his legal status without giving him an opportunity to clear his name. *Alston*, 853 F.3d at 909; *Mann v. Vogel*, 707 F.3d 872, 878 (7th Cir. 2013). Hollins says that this is what happened when he was selected for the program. But not every defamatory statement by a public official is an unconstitutional deprivation of liberty. *Paul v. Davis*, 424 U.S. 693, 702 (1976). The action must also alter a previously recognized legal status or right. *Hinkle v. White*, 793 F.3d 764, 767–68 (7th Cir. 2015). Courts sometime refer to this as a "stigma-plus" injury. *Id.* at 768.

The city defendants contend that they did not injure Hollins because they did not publicly label him as a dangerous repeat offender. But in *Alston*, the court of appeals recognized that because the entire purpose of Madison's focused deterrence program "was to monitor repeat violent offenders, anyone selected for the program carried that brand," and "[w]ithout question, being classified as a 'repeat violent offender' harms one's reputation." 853 F.3d at 909. So there is at least a disputed issue of fact over whether defendants in fact injured Hollins's reputation.

But Hollins fails to show that the selection committee inflicted a stigma-plus injury on him. Hollins alleges several ways that he was injured. He contends that selection for the program altered his legal status by placing him on "high-risk supervision." He also asserts that

26

his enrollment in the program deprived him of a series of legal rights, including the right against ex parte communication in his cases, the right to be notified of ex parte communications, the right to impartial judges, and the rights against selective or vindictive prosecution.

Many of Hollins's asserted rights have to do with the increased scrutiny that he faced on while on probation. He alleges that his placement in the program led to additional "reporting requirements." I also take him to be saying that his probation agent, Joe Packard, was more likely to seek revocation because of Hollins's status in the program.

Hollins provides very little evidence explaining what the additional reporting requirements were. There's no question that he was required to attend the November 8, 2011 notification meeting. But beyond that, Hollins doesn't say what changed because of his placement in the program. The only additional evidence he cites is a newspaper article in which defendant Wiersma was quoted as saying that probation agents would "mak[e] extra contacts with not only the offenders, but also with family members, employers and treatment providers." Dkt. 37-1, at 4. At the summary judgment stage, Hollins has the burden of producing evidence that could prove his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). His failure to explain exactly how he was burdened by his placement in the program dooms a claim about the reporting requirements.

Defendants assert that they did not pressure Packard to push for revocation of Hollins. That may be true, but it would not be surprising if a probation agent would push for revocation if the offender was in the program: one of the points of the program was to show less tolerance toward misbehavior. However, even if defendants knew that Hollins's placement in the program would subject him to a greater risk of revocation, due process claims about increased law enforcement scrutiny have already been rejected in *Alston* and *Smith* because law

enforcement personnel had the authority to make those decisions whether or not the program existed. *See Alston*, 853 F.3d at 910 ("The defendants do not dispute that program members were subjected to increased surveillance and increased punishment. Indeed, that was the program's entire purpose. But neither fact altered Alston's legal rights. . . . The detectives just did what they always had the authority to do: closely monitor Alston's conduct."); *Smith*, 413 F. Supp. 3d at 840 ("Even if I assume that the program required [Smith's probation agent] and the unit detectives to monitor plaintiff's conduct more closely, and that [the probation agent] was more likely to seek revocation of his probation and parole as a result of the program, it is undisputed that these are discretionary decisions that [they] could have made even without the existence of the program."). So I will grant defendants' summary judgment motions on Hollins's due process claims about the effects the program had on his supervision.

Hollins's other set of due process claims are premised on his belief that people associated with the program had ex parte contacts with administrative law judges and circuit court judges, discussing matters directly relating to him. His evidence of this is exceedingly thin. He provides a portion of a document that appears to be a schedule of meetings held by someone involved with the program showing a "presentation" with the Dane County Circuit Court judges. Dkt. 99-1, at 6. Hollins contends that program staff talked to these judges and ALJs directly about his cases, which is not supported by his exhibit. The most reasonable inference from the exhibit—perhaps the only reasonable inference—is that program staff gave a simple informational presentation to the judges about the program.

Hollins appears to argue that ex parte contacts between program staff and judges or ALJs biased them against him in ruling on revocation- or sentence-related matters. But this line of argument has already been rejected in *Alston*. Under *Heck v. Humphrey*, 512 U.S. 477, 487

(1994), a plaintiff cannot maintain a claim under § 1983 suit if a judgment in the plaintiff's favor would "necessarily imply the invalidity" of a prior conviction, sentence, or revocation. A ruling that a judge or ALJ was biased against him would necessarily imply the invalidity of his revocation or sentence. *See Alston*, 853 F.3d at 910 (quoting *Edwards v. Balisok*, 520 U.S. 641, 647 (1997) ("A criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him.")). So he can't bring a due process claim on this ground. I'll grant defendants' motions for summary judgment on these due process claims as well.

### 4. Defendants Wray, Woodmansee, and City of Madison

I granted Hollins leave to proceed on race-discrimination, class-of-one, and due process claims against defendants Wray, Woodmansee, and the City of Madison. The parties' summary judgment materials make clear that Wray and Woodmansee were not directly involved in making candidate-selection decisions. Because they were the architects of the program, they could still theoretically be liable for constitutional problems with the program. But nothing in the summary judgment materials demonstrate a constitutional violation, much less Wray's or Woodmansee's personal involvement in a violation. So I will grant summary judgment to them. Similarly, because Hollins has not shown any constitutional problems with the program, his *Monell* claims against the City of Madison will also be dismissed.


REMAINING DEFENDANTS

That leaves the federal defendants and the state defendants. I've already denied the federal defendants' motion to dismiss, and the state defendants have not yet filed a dispositive motion. Six of the seven remaining defendants (everyone but state defendant Lance Wiersma)

29

were on the program's selection committee, and the reasoning in my summary judgment rulings above about the committee seems almost certain to apply to those defendants as well. Nonetheless, those rulings were based on the facts and legal arguments before me, and in the absence of summary judgment motions filed by the remaining defendants, Hollins was not required to submit the evidence he has against those defendants. So out of an abundance of caution, I'll give Hollins a chance to show cause why I shouldn't dismiss his claims against the six remaining selection-committee defendants for the same reasons that I dismissed the claims against the committee members in this opinion.

As for Wiersma, Hollins alleged that he was a probation supervisor who allowed probationers to be subjected to the constitutionally flawed focused deterrence program. Hollins appears to want to replace Wiersma with supervisor Art Thurmer. *See* Dkt. 100. But such an amendment would be futile unless Hollins can show that Thurmer violated his constitutional rights in some way. I'll give Hollins the same short deadline to show cause why I shouldn't dismiss the claims against the probation supervisor, whether it be Wiersma or Thurmer.

ORDER

IT IS ORDERED that:

1. Plaintiff Emon V. Hollins's motions for extension of time to file summary judgment materials, Dkt. 136 and Dkt. 179, are GRANTED.

2. The motions to correct citations in plaintiff's summary judgment materials filed by the city defendants and by defendants Linda Ketcham and Barbara McKinney, Dkt. 144 and Dkt. 145, are DENIED as moot.

3. Plaintiff's motions for leave to amend his complaint, Dkt. 99 and Dkt. 100, are DENIED.

4. Plaintiff's motion to stay a decision on defendants' summary judgment motions, Dkt. 183, is DENIED.

5.  Plaintiff's motion in limine, Dkt. 174, is DENIED as premature.

6.  The motions for summary judgment brought by defendants Angela Jones, City of Madison, Samantha Kellogg, Jay Lengfeld, Cory Nelson, Paige Valenta, Tom Woodmansee, Noble Wray, Ketcham, and McKinney, Dkt. 113; Dkt. 117; Dkt. 127, are GRANTED.

7.  The motion to dismiss filed by defendants William Baudhuin, Paul Reed, Rita Rumbelow, and Lisa Siegel, Dkt. 87, is DENIED.

8.  Hollins may have until June 19, 2020, to show cause why I should not dismiss his claims against the state and federal defendants.

Entered May 29, 2020.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

31